GRIFFIS, P.J.,
for the Court:
¶ 1. This case considers the breach of a real estate purchase agreement. It began in justice court and was appealed to county court. A county court jury entered a judgment in favor of John and Angela Wilty (the “Wiltys”) against Granville and Angela Alpha (the “Alphas”) for the sum of $45,817.33. The county court denied the Alphas’ post-trial motions. The Alphas appealed the case to the circuit court. There, the circuit court reversed the judgment and decided that the county court judge erred in the denial of the Alphas’ post-trial motion. The Wiltys now appeal the circuit court’s judgment, and the case has been deflected to this Court.
FACTS
¶ 2. On February 19, 2004, the Wiltys entered into a lease agreement with an option to purchase a home located in Olive Branch, Mississippi. The property was owned by Granville and Angela Alpha. The property was managed by Affordable Management LLC, which was owned by Bruce Wring and the Alphas. Angela Alpha is Wring’s daughter, and she acted as an agent on behalf of Affordable Management in the transaction with the Wiltys.
¶ 3. Under the lease agreement, the Wil-tys paid $1,295 in monthly rent. The lease agreement included an option to purchase. This provision read:
(a) Lessee [(Wiltys)] hereby tenders and places with Lessor an Option Payment (the “Option Payment”) in *832 the amount of $1,000.00 (Lesee to pay $3,000 at move in and then the other $1,000 by 3/1/01). At the expiration or earlier termination of this lease for any reason other than a purchase of the Property by [the Wiltys] pursuant to paragraph 25 hereof, the Option Payment shall be considered earned by Lessor and retained by the Lessor as an option fee. In the event of an exercise of the option to purchase, the Option Payment shall not be refunded, but shall be applied to the Option Purchase Price as further provided in paragraph 25 hereof.
¶4. Before they moved in, the Wiltys paid $3,000 of the $4,000 option payment in cash. The Wiltys paid $500 in cash on February 18, 2004. The next day, the Wiltys paid $2,500 in cash. Affordable Management recorded the payments on a document that was titled Lease Option Agreement, a non-refundable up-front money agreement. On March 4, 2004, the Wiltys paid the first month’s rent and the remaining $1,000 of the $4,000 option payment. The $1,000 payment was noted on the rent ledger for that home. Affordable Management gave the Wiltys a receipt for the $4,000 option payment.
¶ 5. Approximately one year later, the Wiltys notified Affordable Management of their intent to exercise the option to purchase the home. Leslie Christian of Real Estate Mortgage Services was the Wiltys’ broker for the transaction. Sherry Davis, who was employed by First National Financial, acted as the closing agent. Davis testified that she received the Wiltys’ loan package on February 8, 2005. Over the next month, Davis and Christian worked with the Wiltys to prepare for the closing.
¶ 6. Davis testified that the Wiltys’ lender had requested documentation from Affordable Management of the $4,000 option paid by the Wiltys. Affordable Management provided a receipt for the Wiltys’ $4,000 option payment. Davis later asked Affordable Management and the Alphas to produce a deposit slip for the $4,000 option payment. Davis was told that there was not one deposit slip that would show a $4,000 deposit of money. The reason given was that Affordable Management handled hundreds of properties and combined monies for large deposits on a regular basis. Also, there was testimony that the Wiltys’ cash payments may have never been deposited in the bank but otherwise used.
¶ 7. The evidence was disputed whether Davis asked for alternative documentation to prove the $4,000 option payment was actually paid. Davis testified that she asked Affordable Management to provide a deposit slip with at least $4,000 included and to prepare an affidavit stating that the Wiltys’ $4,000 payment was included in that deposit. Davis also testified that Wring told her that he did not have such a deposit slip and that the loan would have to close as is or not close at all.
¶ 8. Wring and Angela Alpha testified that Davis never asked them for an existing deposit slip and an affidavit. Wring testified that he never spoke to Davis about the Wiltys’ closing. Davis did not receive any further documentation of the option payment from Affordable Management or the Alphas.
f 9. The closing was set for March 10, 2005. Affordable Management prepared a warranty deed. The settlement statement accounted for the $4,000 option payment, as a credit to the Wiltys that reduced the amount owed.
¶ 10. At approximately 6:00 p.m. on March 10, 2005, the Wiltys signed the closing documents. The Alphas signed the documents the next afternoon. Davis tes *833 tified that the loan would not fund on March 11th because the lender was on the east coast. She said that by the time the Alphas signed the documents and they were transmitted to the lender, it was too late in the day for the lender to review and approve the loan. The Alphas left the signed warranty deed with Davis.
¶ 11. On March 14, 2005, Davis had not disbursed any funds from the transaction. Angela Alpha asked Davis to return the signed warranty deed since the Wiltys’ loan still had not funded. Angela Alpha testified that she told Davis that she would return the warranty deed when the loan was ready to be funded and would sign any additional documents. Davis testified that she did not recall Angela Alpha’s offer to return the warranty deed. The loan transaction had to close before March 25, 2005.
¶ 12. On March 14th, at approximately 5:00 p.m., Angela Alpha picked up the warranty deed. Once Angela Alpha took possession of the warranty deed, Davis testified that she considered the loan transaction to be “dead” because the lender would require new closing documentation. Angela Wilty testified that she received a call from Davis, around noon on March 14, 2005, and Davis told her that the deal was “dead.”
¶ 13. On March 18, 2005, the Wiltys signed a contract for the purchase of another home. On March 21, 2005, the Wil-tys moved out of the home they had leased from Affordable Management.
¶ 14. On April 14, 2005, Affordable Management and the Alphas learned that the Wiltys had vacated the home. John Wilty testified that they did not give notice to Affordable Management or the Alphas of their intention to vacate the property. The Wiltys returned the keys later in April. The Wiltys did not pay rent for the month of April 2005.
¶ 15. The case began in the Justice Court of DeSoto County, Mississippi. Wring filed an eviction action against the Wiltys. A default judgment was entered. The default judgment was set aside for failure to serve process on the Wiltys. Thereafter, the Wiltys filed a counterclaim against Wring. The justice court awarded a judgment in favor of the Wiltys against Wring.
¶ 16. Wring appealed the decision to the county court. The Wiltys then filed their “First Amended Complaint” against Wring, Affordable Management, and Angela and Granville Alpha. It was identical to the counterclaim the Wiltys asserted in justice court. After a trial, the jury returned a verdict that: (1) Affordable Management did not breach the lease-purchase agreement; (2) Affordable Management, Wring, and the Alphas did not convert the Wiltys’ $4,000 option payment; (3) Granville and Angela Alpha breached the real estate purchase agreement; and (4) awarded compensatory damages to the Wiltys in the amount of $45,817.33 for the breach. The Alphas filed a motion for a judgment notwithstanding the verdict (“JNOV”), or in the alternative, a new trial or remittitur. The county court denied the Alphas’ motion.
¶ 17. The Alphas perfected an appeal to the circuit court. On May 19, 2011, the circuit court reversed the county court’s judgment and granted the Alphas’ motion for a JNOV. The circuit court reversed and rendered the judgment in favor of the Alphas. The Wiltys now appeal.
ANALYSIS

1. Whether the circuit court erred when it granted the Alphas’ motion for a JNOV, which reversed the county court’s denial of that same motion.

¶ 18. The standard of review for the grant or denial of a motion for a JNOV *834 is de novo. InTown Lessee Assocs. v. Howard, 67 So.3d 711, 718 (¶22) (Miss.2011). The supreme court has held:
A motion for [a] JNOV is a challenge to the legal sufficiency of the evidence, and this Court will affirm the denial of a JNOV if there is substantial evidence to support the verdict. [The appellate court] will consider the evidence in the light most favorable to the appellee, giving the party the benefit of all favorable inferences that may be reasonably drawn from the evidence. In essence, judgments as a matter of law present both the trial court and the appellate court with the same question — whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.
Id. (internal citations and quotations omitted).
¶ 19. The jury here had to determine whether a duty of good faith and fair dealing required the Alphas to provide the information requested by the lender, and whether the Alphas breached any such duty. The jury decided these questions for the Wiltys. The jury determined that the Alphas owed a duty to provide the requested information, and the Alphas breached their duty when they failed to provide the documentation, which caused the closing to fail.
¶ 20. There was evidence to support the jury’s finding. The evidence here is not so indisputable that the need for a trier of fact has been eliminated. If there is “evidence of such quality and weight that reasonable and fairminded [jurors] in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury’s verdict allowed to stand.” Hammack v. Czaja, 769 So.2d 847, 861 (¶ 9) (Miss.Ct.App.2000) (citing City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss.1983)). The evidence does not overwhelmingly point in favor of the Alphas. Reasonable jurors could have arrived at a contrary verdict, such that the grant of the JNOV by the circuit court in favor of the Alphas was reversible error. “A jury is free to believe or disbelieve the facts presented to it and to evaluate all witnesses and evidence....” Gorman v. McMahon, 792 So.2d 307, 312 (¶ 10) (Miss.Ct.App.2001). “The jury and the judge observed the witnesses and their demean- or — we did not.” Patterson v. Liberty Assocs., 910 So.2d 1014, 1022 (¶24) (Miss.2005).
¶ 21. The circuit court that reviewed the county court jury’s verdict had the same standard of review that we have now. The circuit court, in our opinion, was in error to substitute its judgment “for that of the jury when reasonable jurors could differ on the verdict from the evidence presented.” Id. Therefore, we reverse the circuit court’s judgment that granted a JNOV in favor of the Alphas. We reinstate the jury’s verdict in favor of the Wiltys.

2. Whether a new trial on damages is appropriate.

¶ 22. The reinstatement of the jury’s verdict also requires us to consider an issue argued in the Alphas’ motion for a JNOV. Specifically, the Alphas asked the court to grant a new trial. Their argument was that even if they breached the agreement, the Wiltys failed to prove any damages.
¶ 23. The standard of review for the denial of a motion for a new trial is abuse of discretion. Upchurch ex rel. Upchurch v. Rotenberry, 761 So.2d 199, 206 (¶ 26) (Miss.2000) (quoting Harvey v. Wall, 649 So.2d 184, 187 (Miss.1995)). In Up-church, the supreme court held:
*835 [The appellate court] applies the abuse of discretion standard of review when determining whether a trial court erred in refusing an additur or a new trial. It is primarily the province of the jury to determine the amount of damages to be awarded[,] and the award will normally not be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount[,] and outrageous. The party seeking the additur must prove his injuries, damages, and loss of income. In deciding if the burden has been met, we must look at the evidence in the light most favorable to the party in whose favor the jury decided, granting that party any favorable inferences that may reasonably be drawn therefrom.
In determining whether a jury verdict is against the overwhelming weight of the evidence, [the appellate court] must accept as true the evidence which supports the verdict and will reverse only when convinced that the trial court has abused its discretion in failing to grant a new trial.
Id. (internal citations and quotations omitted).
¶ 24. The jury was instructed that it could award damages for mental anguish and emotional distress. “[U]nder Mississippi law a plaintiff can assert a claim for mental anguish and emotional distress in a breach of contract action.” Univ. of S. Miss. v. Williams, 891 So.2d 160, 172 (¶ 30) (Miss.2004). The supreme court in Williams held:
We take this opportunity to clarify the burden for recovery of mental anguish and emotional distress in breach of contract actions. Plaintiffs may recover such damages without proof of a physical manifestation. Furthermore, expert testimony showing actual harm to prove mental injury is not always required. However, the plaintiff must show (1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish. Such generalizations as “it made me feel bad” or “it upset me” are not sufficient. A plaintiff must show specific suffering during a specific time frame. These requirements are not different from the requirements to establish physical pain and suffering.
Williams, 891 So.2d at 172-73 (¶ 31) (internal citations omitted).
¶ 25. John Wilty testified that Angela Wilty cried every time she dealt with Wring. He testified that “she was in tears,” “she was a wreck,” and “she was depressed.” John stated that she was really happy before they decided to buy the house, then she was very unhappy dealing with Wring, and after losing the house, she was really unhappy.
¶ 26. Dr. Paul King, a psychiatrist, prescribed Zoloft for Angela Wilty. Angela Wilty testified that she takes the maximum dosage. She also testified that she had no other stressors. However, in her deposition, Angela Wilty testified that she “couldn’t say if it was from this or not.” She also testified that she had no medical bills as a result of losing the house. She visited Dr. King at the end of March or the beginning of April.
¶ 27. Angela Wilty testified that she was devastated because she was a young, twenty-three-year-old mother with three children, and this was her first home purchase. Yet, the evidence clearly indicated that the Wiltys bought a house just four days after the purchase of the home at issue here failed to close. Angela Wilty did testify that her current house had an upstairs and wasted space. She said that she did not want an upstairs.
*836 ¶ 28. The evidence to support the Wil-tys’ claim for mental anguish and emotional distress was limited, conclusory, and vague. There were no specific examples, specific time frames, or specific details of suffering. No one testified how being “really unhappy” and “depressed” affected Angela Witty’s life or those around her. No testimony reflected how her depression manifested itself. The jury was not given the specific date she visited the psychiatrist nor any record of that visit.
¶ 29. Evidence such as this can only be characterized as inadequate proof of emotional distress. Generalizations like “it upset me” are insufficient. Williams, 891 So.2d at 173 (¶ 31). The Wiltys must have established how it upset them. They must establish how Angela Witty was affected by being upset. They did not. General declarations of emotional distress are not a sufficient basis for a damage award for mental anguish and emotional distress in a breach-of-contract action. Id. at (¶ 33).
¶ 30. In Strickland v. Rossini, 589 So.2d 1268, 1275 (Miss.1991), the plaintiff sought emotional distress damages based on testimony that she was “very depressed” and “very upset.” The supreme court remanded that case for a new trial on damages due to the general allegations and lack of proof of damages on the record. Id. at 1276. Further, the supreme court has made clear that vague testimony regarding visits to a psychiatrist is not sufficient to support an emotional distress damage award. Ill. Cent. R.R. Co. v. Hawkins, 830 So.2d 1162, 1174-75 (¶¶26-27) (Miss.2002).
¶ 31. John Witty testified that, even before the failed closing, Angela ■ Witty cried every time she talked to Wring. No doctor testified. Even if the Wiltys proved they actually suffered mental anguish, they did not demonstrate that any such anguish was a foreseeable result of the Alphas’ actions or inactions. See Williams, 891 So.2d at 173 (¶ 31).
¶ 32. Here, the jury’s verdict was for a total amount. It did not separately set forth the amount of damages that was awarded for mental anguish and emotional distress. As a result, we must remand the case to the circuit court for a new trial on damages.

3. Conclusion

¶ 33. As set forth above, this Court reverses the circuit court’s grant of a JNOV in favor of the Alphas, which reinstates the jury’s verdict that Granville and Angela Alpha are liable to the Wiltys for the breach of the real estate purchase agreement. However, we remand this case to the circuit court for a new trial on damages because the Wiltys did not present sufficient evidence to support an award for damages for mental anguish and emotional distress in a breach-of-contract action.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY IS REVERSED, AND THIS CASE IS REMANDED TO THE CIRCUIT COURT FOR A NEW TRIAL ON THE ISSUE OF DAMAGES ONLY. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANTS AND THE APPEL-LEES.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, MAXWELL, RUSSELL AND FAIR, JJ„ CONCUR. CARLTON, J„ CONCURS IN RESULT ONLY.